In The

# United States Court of Appeals
# For The Fourth Circuit

## FIRST DATA MERCHANT SERVICES CORPORATION, and FIRST DATA CORPORATION

*Plaintiffs–Appellees and Cross-Appellants,*

v.

## SECURITYMETRICS, INC.,

*Defendant–Appellant and Cross-Appellee.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

## OPENING BRIEF OF SECURITYMETRICS, INC.

Sterling A. Brennan
L. Rex Sears
MASCHOFF BRENNAN LAYCOCK GILMORE
    ISRAELSEN & WRIGHT
201 South Main Street, Suite 600
Salt Lake City, Utah 84111
(435) 252-1360

J. Stephen Simms
SIMMS SHOWERS LLP
201 International Circle, Suite 250
Hunt Valley, Maryland 21030
(410) 783-5795

*Counsel for Defendant–Appellant and
Cross-Appellee*

Michael L. Eidel
Joshua Horn
Clair E. Wischusen
FOX ROTHSCHILD LLP
2000 Market Street, 2nd Floor
Philadelphia, Pennsylvania 19103
(215) 299-2184

Charles N. Curlett, Jr.
LEVIN & CURLETT LLC
201 North Charles Street, Suite 2000
Baltimore, Maryland 21201
(410) 685-0008

*Counsel for Plaintiffs–Appellees and
Cross-Appellants*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellant and cross-appellee SecurityMetrics, Inc., defendant and counterclaimant in the district court action below, has no publicly traded stock and no parent.  No publicly held corporation or other entity whose shares are publicly held or traded owns 10% or more of SecurityMetrics' stock.  SecurityMetrics is not aware of any publicly held corporation that has a direct financial interest in the outcome of this litigation by reason of a franchise, lease, other profit sharing agreement, insurance, or indemnity agreement.

# TABLE OF CONTENTS

INTRODUCTION ................................................................1

JURISDICTIONAL STATEMENT ..................................................5

    A.    The District Court's Subject Matter Jurisdiction ..................5

    B.    This Court's Jurisdiction ........................................6

    C.    Timeliness of Appeal.............................................6

STATEMENT OF ISSUES ......................................................7

    A.    Lanham Act (False Advertising)...................................7

    B.    Tortious Interference ...........................................7

    C.    Antitrust (Restraint of Trade and Attempted Monopolization) ...........8

STATEMENT OF THE CASE.....................................................9

    A.    Factual Background...............................................9

        1.    SecurityMetrics' Business .......................................9

        2.    First Data's Business............................................10

        3.    The Parties' Commercial Relationships ...................................11

    B.    Procedural Background ...........................................11

    C.    Rulings Presented for Review ....................................13

        1.    Lanham Act (False Advertising)..................................13

        2.    Tortious Interference............................................15

        3.    Antitrust (Restraint of Trade and Attempted Monopolization)........................................................17

            a.    Overview of Antitrust Allegations and Theories ...........18

           b.     Antitrust Injury ............................................................20

                i.     Reduced Output ................................................20

                ii.    Frustration of Price Competition........................24

STANDARD OF REVIEW ................................................................26

SUMMARY OF ARGUMENT .........................................................27

    A.    Lanham Act (False Advertising)........................................27

    B.    Tortious Interference ..........................................................27

    C.    Antitrust (Restraint of Trade and Attempted Monopolization) ..........28

ARGUMENT ....................................................................................32

    A.    This Court Should Vacate the District Court's Literal Truth Finding and Remand SecurityMetrics' False Advertising Claim for Jury Trial ........................................................32

        1.    Literal Falsity Encompasses Falsity by Necessary Implication .........................................................33

        2.    What a Message Necessarily Implies Is an Issue of Fact, for the Jury ..........................................35

        3.    The District Court's Resolution of Literal Falsity on Summary Judgment Was an Exercise in Improper "Disputatious Dissection"........................36

    B.    This Court Should Reverse the District Court's Hearsay Ruling and Remand SecurityMetrics' Tortious Interference Claim for Jury Trial ........................................39

        1.    The Proof Requirements Embraced by the District Court Are Untenable, as a Matter of Policy........................42

        2.    The District Court's Proof Requirement Is Unwarranted, as a Matter of Law ................43

        3.     This Court Should Reverse because Mr. Nelson's
Differential Etiology Analysis, Alone, Would Sustain
a Jury Verdict in SecurityMetrics' Favor ................................46

        4.     This Court Should also Reverse because the District
Court's Hearsay Ruling Is Inapposite and Incorrect................48

   C.   This Court Should Reverse the District Court's Antitrust Injury
Ruling and Remand SecurityMetrics' Antitrust Claims for
Jury Trial .......................................................................................53

        1.     The District Court's Reduced Output Ruling Should Be
Reversed .....................................................................................54

            a.     Summary Judgment Was Not Justified by Either
Timing or Expert Testimony Considerations ................55

            b.     The District Court Misallocated the Burden of
Proving whether Unaccounted-for Merchants
"continued operations without obtaining a new
compliance services vendor" .........................................56

            c.     Profitability Analysis Considerations Did Not
Justify Summary Judgment, Either................................58

        2.     The District Court's Ruling on Price Competition
Frustration Should Be Reversed ...............................................60

CONCLUSION .........................................................................................63

CERTIFICATE OF COMPLIANCE ......................................................64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Turbine Technology, Inc. v. Atlas Copco AB*
    295 F. Supp. 2d 1334 (S.D. Fla. 2003) ................................................52

*Air Turbine Technology, Inc. v. Atlas Copco AB*
    410 F.3d 701 (Fed. Cir. 2005) ............................................................52

*Alphonsus Diversified Care, Inc. v. MRI Associates, LLP*
    334 P.3d 780 (Idaho 2014) .................................................................46

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ...................26

*Avis Rent A Car System, Inc. v. Hertz Corp.*
    782 F.2d 381 (2d Cir. 1986) ..................................................34, 35, 38

*Brother Industries, Ltd. v. United States*
    540 F. Supp. 1341 (C.I.T. 1982)..........................................................38

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*
    429 U.S. 477, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977) .......................53

*C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*
    131 F.3d 430 (4th Cir. 1997) ..........................................5, 15, 35, 36

*Capital Imaging Associates v. Mohawk Valley Medical Association*
    996 F.2d 537 (2d Cir. 1993) .........................................................53, 56

*Conwood Co., LP v. US Tobacco Co.*
    290 F.3d 768 (6th Cir. 2002) ........................................................2, 41

*Ervin v. Johnson & Johnson, Inc.*
    492 F.3d 901 (7th Cir. 2007) ..............................................................44

*Gallimore v. Newman Machine Co.*
    301 F. Supp. 2d 431 (M.D.N.C. 2004) ...............................................51

*General Auto Parts Co. v. Genuine Parts Co.*
979 P.2d 1207 (Idaho 1999) ..........................................................44, 45, 46, 47

*Glynn v. EDO Corp.*
710 F.3d 209 (4th Cir. 2013) ...............................................................26

*Herman Schwabe, Inc. v. United Shoe Machinery Corp.*
297 F.2d 906 (2d Cir. 1962) ............................................................49, 50

*Hospital Building Co. v. Trustees of Rex Hospital*
691 F.2d 678 (4th Cir. 1982) ...............................................................53

*Hydrolevel Corp. v. American Society of Mechanical Engineers, Inc.*
635 F.2d 118 (2d Cir. 1980) ................................................................50

*J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*
909 F.2d 1524 (3d Cir. 1990) ..........................................................50, 51

*Kinty v. United Mine Workers*
544 F.2d 706 (4th Cir. 1976) .............................................................2, 43

*Kraft Gen. Foods, Inc. v. BC-USA, Inc.*
840 F. Supp. 344 (E.D. Pa. 1993) ........................................................51

*Morris v. Williams*
433 P.2d 697 (Cal. 1967) ....................................................................57

*Mylan Labs., Inc. v. Matkari*
7 F.3d 1130 (4th Cir. 1993) ................................................................33

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck
Consumer Pharmacies. Co.*, 290 F.3d 578 (3d Cir. 2002) ................................36

*Pace v. Hymas*
726 P.2d 693 (Idaho 1986) .................................................................57

*Reed Construction Data Inc. v. McGraw-Hill Cos.*
49 F. Supp. 3d 385, 411 (S.D.N.Y. 2014) ...........................................33, 34

*Reiter v. Sonotone Corp.*
442 U.S. 330, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979) ...................................54

*Salem v. United States Lines Co.*
370 U.S. 31, 82 S. Ct. 1119, 8 L. Ed. 2d 313 (1962) ........................................55

*Scotts Co. v. United Industries Corp.*
315 F.3d 264 (4th Cir. 2002) ......................................................................33, 36

*Story Parchment Co. v. Paterson Parchment Paper Co.*
282 U.S. 555, 51 S. Ct. 248, 75 L. Ed. 544 (1931)............................................43

*Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*
763 F.2d 604 (4th Cir. 1985) .............................................................................27

*Time Warner Cable, Inc. v. DIRECTV, Inc.*
497 F.3d 144 (2d Cir. 2007) ...................................................................34, 36, 38

*United States v. Denver & Rio Grande Rail Co.*
191 U.S. 84, 24 S. Ct. 33, 48 L. Ed. 106 (1903)..........................................30, 57

*United States v. Portsmouth Paving Corp.*
694 F.2d 312 (4th Cir. 1982) .............................................................................55

*Westberry v. Gislaved Gummi AB*
178 F.3d 257 (4th Cir. 1999) ........................................................................43, 47

**Statutes**

15 U.S.C. § 1 ....................................................................................................19

15 U.S.C. § 2 ....................................................................................................20

15 U.S.C. § 15 ....................................................................................................6

15 U.S.C. § 1116 ................................................................................................5

28 U.S.C. § 1291 ................................................................................................6

28 U.S.C. § 1294 ................................................................................................6

28 U.S.C. § 1331 ................................................................................................6

28 U.S.C. § 1332 ................................................................................................6

**Rules**

Federal Rule of Appellate Procedure 4 ..................................................7

Federal Rule of Civil Procedure 30 .........................................................42

Federal Rule of Civil Procedure 58 ..........................................................6

Federal Rule of Civil Procedure 59 ...................................................6, 12

Federal Rule of Evidence 702 ..........................................................31, 61

Federal Rule of Evidence 803 .............................................17, 28, 51, 52

**Other Authorities**

THE NEW WIGMORE: EXPERT EVIDENCE § 2.5 ...........................55, 59, 60

# INTRODUCTION

SecurityMetrics[1] appeals an order that begins: "The origins of this contentious case lie in [1] a soured business relationship and [2] the settlement of earlier litigation in the United States District Court for the District of Utah." (Joint Appendix ["JA"] 1340.) SecurityMetrics returns to that summary below. But first, a word about why this case *matters*, and not only to its immediate parties.

SecurityMetrics seeks damages from First Data[2] for disrupting nearly 150,000 customer relationships. The revenue that SecurityMetrics would have realized from *each* lost customer is too low, on its own, to cover litigation expenses; but in the *aggregate*, SecurityMetrics lost tens of millions of dollars. First Data obtained summary judgment on the claims at issue primarily by persuading the district court to apply a model of proof suited only to cases involving a mere handful of disrupted customer relationships—in which *each lost customer* can be asked in deposition what the tortfeasor did *to it*, and with what effect. But trying to extend that model to massive-disruption cases, like this one, perversely translates the sheer scale of wrong into immunity because formal and practical constraints limit the group of customers who could be deposed to such a

---

[1] I.e., SecurityMetrics, Inc., appellant and cross-appellee here, defendant and counterclaimant below.

[2] I.e., appellees and cross-appellants First Data Merchant Services Corporation and First Data Corporation, plaintiffs and counter-defendants below.

1

low number that the recoverable damages could never sustain litigation. SecurityMetrics' appeal gives this Court an opportunity to settle how principles articulated by other tribunals in related contexts are to be applied to massive-disruption cases within this Circuit. *See, e.g., Conwood Co., LP v. US Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002) ("to investigate activity at specific retail establishments would have been so costly as to have effectively ended this suit, despite substantial evidence of anti-competitive activity"); *cf. Kinty v. United Mine Workers*, 544 F.2d 706, 725 (4th Cir. 1976) ("the difficulty of calculating loss should not … immunize the defendant from liability").

Returning now to the summary of *this* case—SecurityMetrics and First Data both provide services to merchants who accept payment cards. From 2008 to 2012, they did so cooperatively, pursuant to a contract—under which First Data promoted and paid for *security*, *reporting*, and related services that SecurityMetrics provided to merchants who obtained their *transaction-processing* services from First Data. Due to annual renewals, the agreement should have run to January 2013. But First Data prematurely abrogated it—hence the "soured business relationship" referenced by the district court's order.

As for the "earlier litigation"—"[i]n May of 2012," immediately after *repudiating* its agreement with SecurityMetrics, First Data sued SecurityMetrics in federal court in Utah "and moved for a temporary restraining order and preliminary

2

injunction requiring SecurityMetrics to resume … reporting" as it had under the contract that First Data had just repudiated. (JA 1347.) The Utah court denied First Data's motion; and "[d]espite the fact that First Data had initiated the lawsuit, First Data tendered a settlement payment of $5 million to SecurityMetrics." (JA 1914.)

First Data's settlement payment only *partially* covered SecurityMetrics' damages. SecurityMetrics settled for less than its loss because its primary interest, then as now, was to continue thriving in business; so it reduced its monetary demand in exchange for clear title to a large set of merchant data that it could use to sustain and grow its customer base. But First Data had terminated its relationship with SecurityMetrics in order to facilitate the roll-out of its own, competing security-related service: PCI Rapid Comply. That yielded a new configuration, in which SecurityMetrics had to continue *reporting* to First Data, as before, on behalf of merchants who used First Data for transaction processing, while also *competing* with First Data for the sale of reporting and related services to those selfsame merchants. First Data exploited the dual role it created for itself to compete unfairly and anticompetitively—by disparaging SecurityMetrics' title to the merchant data for which SecurityMetrics had bargained, misrepresenting fee structures, and using tying arrangements to leverage First Data's transaction-processing market power into an unfair advantage in the data-security market.

A few months after settling the Utah case, First Data filed suit *again*, in Maryland, "alleging … misconduct by SecurityMetrics following the settlement." (JA 1914–15.)  First Data's institution of a *second* suit prompted SecurityMetrics to file counterclaims of its own—first in the Utah action, which First Data had not yet dismissed, and then in First Data's second-filed action.  As the Maryland case progressed, First Data's nine claims were whittled down to one; and the district court entered summary judgment against SecurityMetrics on its *tort* counterclaims. The remaining claims on both sides sounded in contract and went to the scope of SecurityMetrics' merchant data rights under the agreement that had settled the first case.  The district court conducted a bench trial on those claims and entered judgment for SecurityMetrics.

Important as it was, the vindication of SecurityMetrics' merchant data rights could not make SecurityMetrics whole for the egregious harms First Data had already inflicted—not only by disparaging SecurityMetrics' title to that data but also by its other unfair and anticompetitive activities.  Accordingly, SecurityMetrics appeals some (not all) of the district court's summary judgment rulings—specifically, the district court's summary adjudication of SecurityMetrics' counterclaims for false advertising, tortious interference, restraint of trade, and attempted monopolization.  The tortious interference and antitrust rulings should be reversed primarily because they are premised on proof requirements

inappropriate to massive-disruption cases. The district court's false advertising ruling presents an independent issue—viz., whether the district court erred by resolving the disputed *factual* issue of literal falsity on summary judgment. *See C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 434 (4th Cir. 1997) (literal falsity "is an issue of fact.").

## JURISDICTIONAL STATEMENT

### A.  The District Court's Subject Matter Jurisdiction

First Data's original and amended complaints alleged state law and Lanham Act claims, and invoked federal question and diversity jurisdiction.  (JA 49, 72.) SecurityMetrics appeals on four counterclaims:  false advertising under the Lanham Act, tortious interference under state (Maryland) common law, and two violations of the Sherman Antitrust Act.  (*See generally* JA 134.)  SecurityMetrics and First Data are of diverse citizenship (for SecurityMetrics—Utah; for First Data—Delaware, Florida, and Georgia).  SecurityMetrics' tortious interference claim shares a common nucleus of operative fact with its Lanham and Sherman Act claims and puts more than $75,000 in controversy.  Thus, the district court's subject matter jurisdiction over SecurityMetrics' appealed claims was properly invoked as follows:

> (1)    the Lanham Act claim, under 15 U.S.C. §§ 1116 (Lanham Act
>
> injunction), 1117 (Lanham Act damages), and 1121(a) (Lanham Act),

as well as 28 U.S.C. §§ 1331 (federal question) and 1338(a) (federal trademark legislation);

(2)     the state common law claim, under 28 U.S.C. §§ 1332 (diversity) and 1367 (supplemental); and

(3)     the Sherman Act claims, under 15 U.S.C. §§ 15 (antitrust damages) and 26 (antitrust injunction), and 28 U.S.C. § 1331 (federal question).

## B.     This Court's Jurisdiction

The appealed rulings were made in an interlocutory summary judgment Order (JA 1383) dated December 30, 2014.  A bench trial held on January 12 and 13, 2015 resulted in a January 22, 2015 Order & Judgment (JA 1582) reciting, in part, "Judgment is entered in favor of … SecurityMetrics, Inc. against … First Data" and "[t]his Order shall be … a final Judgment within the meaning of Fed. R. Civ. P. 58."  SecurityMetrics appeals the December 30 Order, as made appealable by the January 22 Order & Judgment.  This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1294(1).

## C.     Timeliness of Appeal

On February 19, 2015, SecurityMetrics timely moved the district court for relief under FEDERAL RULE OF CIVIL PROCEDURE ("FRCP") 59 (JA 1584), which the district court denied on September 22, 2015 (JA 1944).  SecurityMetrics'

October 22, 2015 notice of appeal (JA 1946) was timely under FEDERAL RULE OF APPELLATE PROCEDURE 4(a), subdivisions (1)(A) and (4)(A).

## STATEMENT OF ISSUES

### A.      Lanham Act (False Advertising)

If an accused advertisement is *literally true* but *misleading*, extrinsic evidence of confusion or deception is required.  But a *literally false* advertisement is actionable *without* extrinsic evidence.  Here, the district court ruled, "a reasonable jury could only conclude that the [accused] statements are misleading rather than literally false"; and then granted summary judgment, for lack of extrinsic evidence.  Thus one issue on appeal is:  *Did the district court err by ruling that no reasonable jury could find the accused advertisements literally false?*

### B.      Tortious Interference

SecurityMetrics claimed that First Data, through its false advertisements and other misconduct, tortiously interfered with SecurityMetrics' current and prospective customer relations.  To show the causal nexus between First Data's misconduct and SecurityMetrics' losses, SecurityMetrics relied on both (1) email exchanges and recordings of calls with customers and (2) expert quantitative analysis showing inordinately high attrition among SecurityMetrics customers exposed to First Data's misconduct.  The district court ruled that the emails and

recordings were inadmissible hearsay and then, without considering the expert analysis, granted summary judgment. The general issue is *whether SecurityMetrics presented sufficient evidence of causation*. That resolves into two subsidiary inquiries: (1) *was the district court's hearsay ruling correct* and (2) *was the* totality *of SecurityMetrics' evidence, either with or even without the evidence excluded as hearsay, sufficient to defeat summary judgment?*

## C.  Antitrust (Restraint of Trade and Attempted Monopolization)

Although SecurityMetrics' claims for restraint of trade and attempted monopolization are distinct, they were summarily adjudicated on the same ground: allegedly insufficient evidence of antitrust injury—i.e., injury done by First Data *to competition* and not merely *to SecurityMetrics*. SecurityMetrics identified two cognizable antitrust injuries: reduced output (fewer customers obtaining compliance services) and frustrated price competition. But the district court ruled that SecurityMetrics had not presented sufficient evidence of either "to survive … summary judgment." The final issue on appeal is: *Did the district court thereby err?*

**STATEMENT OF THE CASE**

**A.     Factual Background**

**1.     SecurityMetrics' Business**

SecurityMetrics and First Data provide various services to merchants who accept cards as a form of payment, including services relating to the PCI Data Security Standards ("PCI DSS" or "PCI Standards") promulgated by the PCI Security Standards Council ("PCI Council").  (Although "PCI" is a general acronym for "Payment Card Industry," it is most commonly used more narrowly to reference the PCI Standards, PCI Council, or both.  "PCI compliance" is shorthand for compliance with the PCI Standards.)

The PCI Council was launched in 2006 by a group of payment card brands (including MasterCard, Visa, and American Express).  Its mandate includes developing the PCI Standards and certifying service providers, but "enforcement of compliance with the PCI DSS and determination of any non-compliance penalties are carried out by the individual payment brands and not by the Council."  *See* https://www.pcisecuritystandards.org/organization_info/index.php.

For PCI compliance purposes, MasterCard and Visa classify merchants into different "Levels," based on their type and annual volume of payment card transactions.  Level 1 merchants have the highest transaction volume, Level 4 the lowest.  When required to validate compliance, Level 4 merchants complete a self-

9

assessment questionnaire ("SAQ") developed by the PCI Council. SecurityMetrics' services include (1) providing to Level 4 merchants an online tool for completing their SAQs and then (2) reporting those merchants' validation to their acquirers and payment processors—including First Data. (*See generally* JA 1342–44.)

### 2. First Data's Business

In a payment card transaction, a consumer uses a card issued by a financial institution. This "issuing bank" bills and collects from the consumer. Likewise on the merchant side, the merchant contracts with another financial institution, known as a "merchant bank" or "acquirer," which acquires the merchant's payment card transactions and settles them to the merchant's account. Because First Data is not a financial institution it is not itself an acquirer; but First Data is commonly referred to as an acquirer because, by arrangement with various financial institutions, it acts as acquirer to about 820,000 Level 4 merchants.

First Data also is a payment processor; i.e., it processes payments through the payment network. First Data processes payments for millions of merchants, above and beyond the 820,000 Level 4 merchants for which it also acts as acquirer. This case concerns the 820,000 Level 4 merchants in First Data's acquirer portfolio. (*See generally* JA 1342–43.)

### 3. The Parties' Commercial Relationships

In 2008, SecurityMetrics contracted to become First Data's "preferred vendor" of PCI compliance services to the 820,000 Level 4 merchants in First Data's acquirer portfolio. In 2012, First Data wrongfully terminated its arrangement with SecurityMetrics in favor of a newly launched in-house program branded "PCI Rapid Comply."

Both before and after First Data terminated its arrangement with SecurityMetrics, Level 4 merchants also had the options of self-reporting or using third-party vendors other than SecurityMetrics for PCI compliance. But before termination, SecurityMetrics' share of the 820,000-merchant market greatly exceeded all the other vendors' combined shares; and after termination, although PCI Rapid Comply displaced SecurityMetrics as the dominant service, SecurityMetrics still served more merchants than any other third-party provider.

As discovery was closing in the action below, First Data announced it would wind down its in-house program and outsource again—this time to Trustwave, a different vendor. (*See generally* JA 1345–46.)

### B. Procedural Background

This is First Data's second suit against SecurityMetrics. First Data brought the first in Utah—after repudiating its preferred-vendor agreement with SecurityMetrics, four months into that agreement's latest one-year renewal.

Immediately after commencing that first action, First Data moved to enjoin SecurityMetrics to continue performing the same services as under the agreement First Data had just repudiated. When the Utah court denied First Data's motion, First Data dropped its demand for continued services, at least for a time, and also agreed to pay SecurityMetrics $5 million in damages.

Several months later, First Data commenced this litigation by suing in Maryland. Ultimately, First Data's claims were all either voluntarily dismissed or adjudicated in SecurityMetrics' favor.

SecurityMetrics, for its part, pleaded counterclaims generally falling into four categories: contract, Lanham Act, common law torts, and antitrust. After First Data was granted summary judgment on SecurityMetrics' Lanham Act, common law tort, and antitrust claims, the parties consensually resolved some of their contract disputes; and one unresolved contract issue went to bench trial, which SecurityMetrics won.

After final judgment was entered, First Data filed a motion for attorney fees (which prompted a responsive fees motion from SecurityMetrics) and SecurityMetrics filed a motion seeking relief from the district court's summary judgment ruling under FRCP 59. First Data's objections to SecurityMetrics' costs bill are still pending; all other post-judgment motions were denied. (*See generally* JA 1918–23, 1944.)

### C. Rulings Presented for Review

SecurityMetrics appeals some, but not all, of the district court's summary judgment rulings. Specifically, SecurityMetrics appeals the district court's summary adjudication of four SecurityMetrics counterclaims: one for false advertising under the Lanham Act, another for tortious interference, and two for antitrust violations. Those were pleaded as the Fifth, Ninth, Tenth, and Eleventh Counterclaims, respectively, in SecurityMetrics' operative pleading. (*See* JA 189–91, 194–97.)

#### 1. Lanham Act (False Advertising)

First Data, both before and after repudiating its preferred vendor agreement with SecurityMetrics, charged Level 4 merchants in its acquirer portfolio an annual PCI "compliance fee." While still under contract with SecurityMetrics, First Data paid SecurityMetrics out of that fee for services rendered by SecurityMetrics to those merchants. After First Data terminated the contract, it announced that merchants who used SecurityMetrics would have to both (1) pay the annual compliance fee to First Data *and* (2) separately pay SecurityMetrics for its services. But *secretly*, First Data implemented a policy under which SecurityMetrics customers who complained about the double payment would be refunded enough of their First Data compliance fee to cover what they paid to SecurityMetrics. (*See* JA 621–23.)

First Data's *advertising* contradicted its actual *practice*. First Data advertised (with boldface italics added):

> If you choose … a third-party vendor for PCI DSS compliance services, you will need to contract with and pay that vendor directly. ***In addition*** to your alternate vendor's charges … you still will need to pay the Compliance Service Fee …. The Compliance Service Fee ***is not affected*** by your choice to use a third-party vendor.

And:

> If First Data's PCI compliance services are contractually available to you, you will be charged an applicable annual compliance fee for those services, regardless of whether you use them or utilize the services of some other third-party PCI compliance services vendor. If you utilize the additional services of a third party vendor, you will pay that third party vendor's charges for those fees ***in addition*** to First Data's annual compliance fee.

SecurityMetrics claimed that those representations, to merchants considering making use of SecurityMetrics' PCI compliance services, constituted false advertising under the Lanham Act. (*See* JA 190.)

When First Data attacked SecurityMetrics' claim on a motion to dismiss, the district court ruled:

> Because SecurityMetrics' Counterclaim is articulable as an affirmative misstatement—i.e., that merchants will pay for the service but that some do not because of the refund—this Court finds that SecurityMetrics has stated a plausible claim.

(JA 229–30.)  But when First Data renewed its attack on summary judgment, the

district court—without warning or any other intervening change in

circumstances—reversed course:

> when viewed on their face and in light of the evidence in this
> case, the statements are not false.  The statements are only
> problematic due to what was left unsaid—that a refund might be
> available.  As such, a reasonable jury could only conclude that
> the statements are misleading rather than literally false …

(JA 1368–69.)

"Whether an advertisement is literally false is an issue of fact."  *C.B. Fleet*,

131 F.3d at 434.  SecurityMetrics seeks reversal of the district court's foundational

determination that "a reasonable jury could only conclude that the statements are

misleading rather than literally false"—because as the district court's own prior

ruling recognized, "SecurityMetrics' Counterclaim is articulable as an affirmative

misstatement," and a *factfinder*, not a judge sitting in summary judgment, should

have decided whether that articulation is correct.

## 2.    Tortious Interference

The advertisements quoted above, together with other misconduct, also

support SecurityMetrics' tortious interference claim.  On summary judgment, First

Data did not dispute that it engaged in the misconduct that SecurityMetrics alleged.

Instead, the issue was whether SecurityMetrics had shown a causal nexus between

its harms and First Data's misconduct.

SecurityMetrics' causation evidence has two parts. First, an expert's quantitative analysis shows that SecurityMetrics experienced inordinately high attrition among First Data's Level 4 *acquirer* customers (i.e., customers exposed to First Data's misconduct).[3] Second, in email exchanges and call recordings, customers either refusing or canceling SecurityMetrics' services gave reasons that linked their decisions to First Data's misconduct. (*See generally* JA 1809–26, 1829–40.)

The district court had already denied First Data's motion to exclude Clarke Nelson, the expert through whom SecurityMetrics' quantitative evidence was presented, dismissing First Data's criticisms with the observation that Mr. Nelson's report "reflects a complex analysis that included calculation and consideration of SecurityMetrics' natural attrition and penetration rates and a variety of other factors." (JA 1176.) But the district court's summary judgment ruling did not even mention that evidence (in connection with tortious interference). Instead it considered only the emails and call recordings, which it held inadmissible hearsay. Based on that hearsay ruling, the district court concluded:

---

[3] As of June 1, 2012, in round numbers, 360,000 merchants in First Data's Level 4 acquirer portfolio were enrolled for SecurityMetrics' services; but by July 25, 2014, that number had fallen precipitously, by about 280,000, to about 80,000 merchants. SecurityMetrics submitted an expert analysis showing that attrition was more than double what it should have been, even after making allowances for historical trends and including a "kicker" for the newly competitive relationship with First Data. (*See* JA 736–37.)

> SecurityMetrics has failed to offer any admissible evidence in support of its common law counterclaims. Accordingly, First Data's [summary judgment] motion will be granted …

(*See generally* JA 1372–75.)

SecurityMetrics seeks reversal of the hearsay ruling, and with it the summary judgment ruling, based on the state of mind exception set forth in FEDERAL RULE OF EVIDENCE ("FRE") 803(3). More fundamentally, SecurityMetrics seeks reversal of the summary judgment ruling on the further ground that *even if the hearsay ruling stands*, the totality of SecurityMetrics' evidence—which includes the quantitative analysis presented to but not considered by the district court—raised a triable issue of fact as to causation.

### 3. Antitrust (Restraint of Trade and Attempted Monopolization)

On summary judgment, First Data attacked SecurityMetrics' antitrust claims for alleged failure to demonstrate antitrust injury, i.e., injury done *to competition* and not just *to SecurityMetrics*. First Data also made several narrower arguments, directed to particular claims and theories, focusing primarily on market definition and power and the coerciveness of its tying arrangements; but the district court did not reach those. SecurityMetrics prefaces its statement of the antitrust injury case with a summary of its broader antitrust allegations and theories.

### a. Overview of Antitrust Allegations and Theories

First Data has two distinct relationships with its PCI Rapid Comply customers, one as ersatz acquirer and another as provider of PCI compliance services. First Data already had power in the market for providing acquirer services to those customers. First Data used several tying mechanisms to leverage that power into influence over the merchants' compliance-services decisions.

First, First Data charged *all* its acquirer customers the annual compliance fee discussed above, then provided PCI Rapid Comply to them at no *additional* cost. Merchants unaware of First Data's concealed refund policy were thus threatened with double-payment if they used a third-party service (such as SecurityMetrics'); and even merchants who became aware of the policy were incentivized to use PCI Rapid Comply rather than SecurityMetrics because it is easier to use a service already paid for than to use another and obtain a refund to cover the cost.

A second tying mechanism operated through independent sales organizations ("ISOs")—which assemble, and negotiate on behalf of, *portfolios* of merchants. First Data, as acquirer, imposes minimum billing requirements on ISOs. ISOs who do not meet their minimums must make up any shortfall out of their own revenues. First Data counts annual compliance fees paid by ISOs' merchants for PCI Rapid Comply toward those minimums, but not fees paid by those merchants to SecurityMetrics (or refunded to those merchants, to cover what

they paid to SecurityMetrics).  That is a powerful incentive for ISOs to steer their merchants toward PCI Rapid Comply.

A third tying mechanism also operated on ISOs.  First Data, in its capacity as acquirer, bills and collects fees from merchants both for itself and for ISOs. Industry practice is to make available to ISOs a handful of fungible billing entries they can use for fees not encompassed within those collected by First Data.  But First Data imposed monthly per-merchant and annual portfolio fees on ISOs who used those entries to bill through fees paid to third-party PCI compliance vendors.

The contracts embodying the foregoing ties—between First Data qua acquirer, on the one hand, and merchants and ISOs, on the other—constitute tying agreements in restraint of trade.  First Data also built an *informal* combination in restraint of trade, around the core of its *formal* tying agreements, by misleading ISOs as to SecurityMetrics' contract rights.  (First Data led ISOs to believe that SecurityMetrics did not have data rights relating to so-called "unenrolled merchants," which the district court ultimately found SecurityMetrics *did* have, and even rights that *First Data never disputed* relating to so-called "enrolled merchants.")

The tying arrangements summarized above violate Section 1 of the Sherman Act, 15 U.S.C. § 1; and also are part of First Data's attempt to monopolize the market for providing PCI compliance services to its acquirer merchants, in

violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Other acts in furtherance of the attempted monopolization include the false advertisements described above and serial prosecution of baseless civil litigation. (*See generally* JA 747–52, 1375–79.)

### b. Antitrust Injury

On summary judgment, First Data argued, *inter alia*, that SecurityMetrics had no evidence of antitrust injury. SecurityMetrics responded by identifying evidence of two distinct antitrust injuries, viz., (1) a reduction in output and (2) that price competition had been frustrated. (*See* JA 752–56.)

### i. Reduced Output

For reduced output, SecurityMetrics presented (1) evidence drawn from its own records that between June 2012 and July 2014, it lost roughly 280,000 Level 4 merchants for whom First Data served as acquirer, and (2) First Data's response to a SecurityMetrics interrogatory, according to which only about 70,000 out of those lost merchants had migrated to First Data's PCI Rapid Comply. SecurityMetrics showed that a jury could reasonably infer that many of the 210,000 unaccounted-for merchants had *foregone* PCI compliance services altogether, which would constitute a reduction in output. (*See* JA 753.)

SecurityMetrics also pointed out that First Data profits from reducing output because First Data, qua acquirer, charges noncompliance fees to merchants who do

not validate compliance.  Non-compliance fees—also known as Non-receipt of PCI Validation Fees, or NVF—typically run between $8 and $15 per merchant per month ($96–$180/year) for ISO merchants and $19.95 per merchant per month ($239.40/year) for non-ISO merchants; while First Data's Annual Compliance Fees, or ACF, typically run $3 per merchant per month ($36/year) for ISO merchants and between $79.00 and $124.99 per year for non-ISO merchants. Given that pricing, First Data's highest revenue opportunity is NVF from merchants who do not validate compliance.  Next is ACF from merchants who validate compliance using PCI Rapid Comply.  The *worst* revenue generator is a merchant who pays *reduced* ACF and no NVF because it validates compliance through a third-party vendor.  In tabular form:

| | | Validates Compliance? | |
|---|---|---|---|
| | | Yes | No |
| Uses Third-party Vendor? | Yes | Lowest revenue because: 1. ACF reduced by "empowerment policy" refund 2. Pays no NVF | Most revenue because: 1. Pays full ACF 2. Pays NVF |
| | No | Intermediate revenue because: 1. Pays full ACF 2. Pays no NVF | Most revenue because: 1. Pays full ACF 2. Pays NVF |

For example, a non-ISO merchant paying First Data a $79 annual ACF and $59 per year for SecurityMetrics' service, who validates compliance through SecurityMetrics, could have obtained a $59 refund to cover what it paid SecurityMetrics, leaving First Data with just $20. First Data would make $79 per year from that merchant if it validated compliance through PCI Rapid Comply, and $318.40 per year if the merchant did not validate compliance at all. As the example illustrates, First Data had an incentive to reduce output because merchants validating compliance through PCI Rapid Comply are only its *second*-best revenue opportunity, while merchants validating through SecurityMetrics (or some other third party) are the worst. (*See* JA 753–54.)

The district court faulted SecurityMetrics for supposedly "assum[ing] that those merchants have continued operations without obtaining a new compliance services vendor." (JA 1377.) More broadly, the district court held that "SecurityMetrics' [reduced output] allegations are [not] sufficient to survive First Data's motion for summary judgment" because:

> First Data preliminarily argues that SecurityMetrics only proposed its reduced output theory for the first time at the summary judgment stage …. Indeed, this Court has been unable to identify any discussion of such a theory anywhere else in the docket.
>
> Even if SecurityMetrics had properly raised the issue of reduced output …. No expert has testified to the issue of reduced output, and SecurityMetrics['] reference to merchants who have dropped off the PCI compliance service rolls is purely

speculative. Without conducting any third-party discovery, SecurityMetrics simply assumes that those merchants have continued operations without obtaining a new compliance services vendor. Moreover, SecurityMetrics has provided no analysis to back up its assertions regarding the profitably and revenue potential from First Data's non-compliance fees.

(JA 1377.) In a later ruling, the district court more succinctly summarized its rationale as follows:

the reduced output theory was newly raised at the summary judgment stage; was unsupported by any expert testimony or information obtained through third party discovery; and relied upon speculative conclusions rather than facts in the record.

(JA 1934.)

SecurityMetrics seeks reversal of that ruling, most centrally because the district court misallocated the burden of proof. Because First Data, qua acquirer, has superior access to information about which merchants "have continued operations," it was *First Data's* burden to produce evidence that the 210,000 merchants no longer being serviced by SecurityMetrics, who had not switched over to PCI Rapid Comply, were no longer processing through First Data. Thus it was error for the district court to shift to SecurityMetrics the burden of proving that those merchants "ha[d] continued operations without obtaining a new compliance services vendor."

## ii.    Frustration of Price Competition

Plainly, First Data's pricing policies undermine price competition, by preventing price competition altogether.  First Data advertised that merchants who engaged third-party vendors would still have to pay for First Data's service, *in addition to* the third-party's service—which obviously would make it impossible for merchants to pay less by using a third-party vendor.  And even First Data's secret refund policy, described above, did not permit third parties to *undercut* First Data's price:  by limiting its refunds to what merchants paid to third-party vendors, First Data ensured that the best a merchant could do by using a third-party vendor was to pay *no more* than it would by using First Data's PCI Rapid Comply; under no circumstance could a merchant pay *less* by using a third-party vendor.  Thus First Data prevented price competition for whatever portion of the market to which it applied its advertised payment policy, its secret refund policy, or both.

So Dr. Christopher Pleatsikas, SecurityMetrics' antitrust expert, testified that *if* First Data widely applied its policies *then* price competition would have been widely frustrated (or "muted," to use his term).  He explained in deposition why he did not opine on whether First Data *had* widely implemented its policies.  Those policies were described in program-rollout documents produced by First Data.  Because those documents did not describe any limitations on implementation, they fairly implied that the policies would be universally implemented.  But First Data's

attorneys insisted that First Data had *not* implemented them marketwide.  First Data produced very few actual contracts by which its limited-implementation claim could be tested, and the few contracts that were produced did not support the claim; but without more contracts, the conflict between First Data's rollout documents and its limited-implementation hypothesis presented a factual issue on which Dr. Pleatsikas would not weigh in.  SecurityMetrics planned to offer Dr. Pleatsikas' testimony at trial and let the jury decide how widespread the conduct was, from both the rollout documents that were produced and First Data's failure to present actual contracts showing that the policies articulated in the rollout documents had not been implemented.  (*See* JA 578–83.)

SecurityMetrics also presented other evidence that price competition had been frustrated.  First, SecurityMetrics pointed out that as between it and First Data (far and away the largest providers in the market), First Data had quickly eclipsed SecurityMetrics—locking up a greater share of the market than SecurityMetrics and all other vendors *combined*—even though First Data's prices were higher than SecurityMetrics'.  Second, SecurityMetrics presented an uncontroverted percipient declaration establishing that, in contrast to its experience with First Data, SecurityMetrics *was* able to compete with *other* vendors on price.  (*See* JA 754–56.)

The district court ruled:

> this Court is troubled that SecurityMetrics intends to proceed …
> absent any expert testimony.  SecurityMetrics looks only to the
> prices of First Data and itself and includes no factual discussion
> or analysis of the price of competitors in the marketplace.  In
> light of these circumstances … SecurityMetrics has failed to
> offer sufficient evidence to survive … Summary Judgment …

(JA 1378.)  SecurityMetrics seeks reversal of that ruling, as well—because (1) expert testimony was *not* required, (2) SecurityMetrics *did* present expert testimony, and (3) SecurityMetrics' percipient evidence was not limited "to the prices of First Data and itself."  (*See* JA 747–56.)

## STANDARD OF REVIEW

On appeal, this Court decides the issues that SecurityMetrics has presented *without* deference to any of the district court's summary judgment rulings, "applying the same legal standards as the district court."  *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013).  The fundamental inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  If, "view[ing] the facts and draw[ing] all reasonable inferences in the light most favorable to the non-moving party," *Glynn*, 710 F.3d at 213, "a fair-minded jury could return a verdict for the [claimant] on the evidence presented" or, equivalently, "reasonable jurors could find … that the [claimant] is entitled to a verdict," then summary judgment was improper.  *See Anderson*, 477 U.S. at 252.

"Summary judgment is generally not favored in antitrust cases." *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.*, 763 F.2d 604, 610 (4th Cir. 1985).

## SUMMARY OF ARGUMENT

### A. Lanham Act (False Advertising)

First Data expressly advertised that payments made by merchants to third-party PCI compliance vendors would be "in addition" to compliance fees paid to First Data, which supposedly were "not affected" by using third-party vendors. But the truth was that on request, payments to third-party vendors were offset by compliance fee refunds. The district court recognized that the mismatch between advertisement and reality made First Data's statements "problematic," yet ruled that no reasonable jury could find them *false*.

If a statement is "problematic" then it admits of an interpretation that renders it *false*; and because literal falsity is a question of fact, not law, it was for the jury to decide whether First Data's admittedly "problematic" advertisements should be thus construed. This Court should reverse because the district court, on summary judgment, usurped the factfinder's role.

### B. Tortious Interference

The district court summarily adjudicated SecurityMetrics' tortious interference claim on the ground that SecurityMetrics failed to present admissible evidence of causation. First, the district court ruled that emails and call recordings

27

presented by SecurityMetrics were inadmissible hearsay; then, based on an incorrect characterization of those as SecurityMetrics *only* evidence that First Data's conduct caused SecurityMetrics' losses, granted summary judgment.

This Court should reverse and remand for jury trial, both because (1) the district court failed to consider *other* evidence, not covered by its hearsay ruling, and (2) the district court's hearsay ruling, based upon which it excluded the evidence it did consider, is incorrect.  Taking those in order, first, SecurityMetrics presented an expert analysis from Mr. Nelson, identifying First Data's conduct as the likely cause of inordinately high attrition among Level 4 merchants for whom First Data acts as acquirer.  The district court itself elsewhere lauded Mr. Nelson's as "a complex analysis that included calculation and consideration of SecurityMetrics' natural attrition and penetration rates and a variety of other factors."  (JA 1176.)  That analysis is independently sufficient evidence of causation, which the district court failed to take into account when it granted summary judgment.  Second, the limited evidence that the district court did consider *is* admissible, under FRE 803(3), as evidence of third-party merchants' state of mind—to prove which is all that they were offered for.

## C.    Antitrust (Restraint of Trade and Attempted Monopolization)

SecurityMetrics presented two species of antitrust injury:  reduced output and frustration of price competition.  Sufficient evidence of *either* should have

defeated summary judgment.  In fact, SecurityMetrics presented evidence

sufficient to take *both* antitrust injuries to trial and the district court's contrary

rulings are premised on a misallocation of the burden of production.

The first antitrust injury, reduced output, is that First Data's conduct resulted

in fewer merchants receiving PCI compliance services.  In support,

SecurityMetrics pointed out that 210,000 merchants (more than a fourth of the

entire relevant market) who left SecurityMetrics after First Data launched PCI

Rapid Comply never enrolled for PCI Rapid Comply.  The district court ruled that

was too speculative because "[w]ithout conducting any third-party discovery,

SecurityMetrics simply assumes that those merchants have continued operations

without obtaining a new compliance services vendor."  (JA 1377.)  But

SecurityMetrics could not properly have been required to take third-party

discovery of 210,000 merchants, or even any significant fraction thereof.

Nonetheless, SecurityMetrics was not proceeding on any naked assumption.  First

Data, in its acquirer role, maintains records that reveal whether or not "those

merchants … continued operations without obtaining a new compliance services

vendor."  Indeed SecurityMetrics asked for that information in discovery, but First

Data generally refused to produce it.  The limited evidence that First Data did

produce supports SecurityMetrics' position; and even if there were *no* evidence, it

would have been permissible for the jury to infer that SecurityMetrics' lost

customers *had* "continued operations without obtaining a new compliance services vendor" because First Data failed to present information already in its possession and not otherwise reasonably available to SecurityMetrics. *See United States v. Denver & Rio Grande R. Co.*, 191 U.S. 84, 92, 24 S. Ct. 33, 48 L. Ed. 106 (1903). So instead of indulging a contrary inference and granting summary judgment, the district court should have let SecurityMetrics take reduced output to trial.

The second antitrust injury is frustration of price competition: First Data's advertised pricing policy and its secret refund policy both made it impossible for merchants to pay less by using a third-party vendor instead of PCI Rapid Comply. The district court gave two reasons for summarily adjudicating the price-competition injury: (1) "this Court is troubled that SecurityMetrics intends to proceed on such a claim absent any expert testimony" and (2) "SecurityMetrics looks only to the prices of First Data and itself and includes no factual discussion or analysis of the price of competitors in the marketplace." (JA 1378.) The facially anticompetitive character of First Data's advertised pricing policy and its secret refund policy, alone, should have prevented summary judgment. Moreover, both of the district court's criticisms are incorrect.

First, SecurityMetrics *did* present expert testimony on price competition. Dr. Pleatsikas' opined that First Data's policies would frustrate price competition if

widely implemented.  His opinion would have been sufficient to support a jury

verdict, notwithstanding the wide-implementation condition:

> an expert on the stand may give a dissertation or exposition of
> scientific or other principles relevant to the case, leaving the trier
> of fact to apply them to the facts. …   [O]pinions are not
> indispensable … when … the trier can itself draw the requisite
> inference.

FRE 702, Advisory Comm. Note.  The jury did not need an expert to tell it whether

First Data's implementation was widespread; it could have drawn its own inference

about that from documentary and other evidence—including (1) First Data's

rollout materials, which forecasted universal (not limited) implementation, and (2)

First Data's failure to support its limited-implementation hypothesis with any

actual evidence.  And if the jury decided that First Data's implementation was

widespread then it properly could have relied on Dr. Pleatsikas' opinion to

conclude that price competition was thereby frustrated.  Because a jury is

competent to decide whether the factual premise of Dr. Pleatsikas' hypothetical

conclusion was met, summary judgment was improper.

Second, SecurityMetrics' percipient evidence was not limited to "the prices

of First Data and itself."  SecurityMetrics presented an uncontroverted percipient

declaration establishing a competitive price point, below First Data's pricing, for

*all* competitors in the market, not just SecurityMetrics.

## **ARGUMENT**

**A.  This Court Should Vacate the District Court's Literal Truth Finding and Remand SecurityMetrics' False Advertising Claim for Jury Trial**

As more fully explained above, even after First Data repudiated its preferred vendor agreement and began competing with SecurityMetrics, First Data still maintained an unadvertised policy under which SecurityMetrics customers could receive a refund, out of the compliance fee that First Data charged them, of what they had paid to SecurityMetrics.  Although merchants who wanted to stay with SecurityMetrics had to complain to First Data about double payment, in order to obtain the refund, at least the refund was available on demand so that they could stay with the provider they preferred without paying more.

But First Data *advertised* something different.  First Data *advertised* that any "third party vendor's charges" would be "in addition to First Data's annual compliance fee" and that "[t]he Compliance Service Fee is not affected by your choice to use a third-party vendor."  (*See* JA 190.)  Based on those advertisements, SecurityMetrics sued for false advertising under the Lanham Act.

The district court granted summary judgment because it reasoned that the advertisements were *literally* true, notwithstanding the secret refund policy.  (JA 1368–69.)  As shown below, the district court thereby erred because the literal truth of the advertisements should have been decided by the jury.

### 1.     Literal Falsity Encompasses Falsity by Necessary Implication

To constitute false advertising, "the contested statement or representation must be either false on its face or, although literally true, likely to mislead and to confuse consumers." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1138 (4th Cir. 1993).

> The difference between the two classes of falsity [i.e., between literal falsity and misleading] is the comparison that each invites. A determination of literal falsity invites a comparison "between the statement and … reality," while a determination of implicit falsity invites a comparison between the "impression on the listener" and reality.

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 411 (S.D.N.Y. 2014) (in part quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007)).  Here SecurityMetrics asserts literal falsity, a mismatch between First Data's statements and reality.

"A literally false message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 274 (4th Cir. 2002) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586–587 (3d Cir. 2002)).

> [Under] the "false by necessary implication" doctrine. … a district court evaluating whether an advertisement is literally

> false "must analyze the message conveyed in full context," *i.e.*, it "must consider the advertisement in its entirety and not … engage in disputatious dissection." If the words or images, considered in context, necessarily imply a false message, the advertisement is literally false and no extrinsic evidence of consumer confusion is required.

*DIRECTV*, 497 F.3d at 158 (internal citations omitted) (in part quoting *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993) and *Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381, 385 (2d Cir. 1986)).

> This is a fine distinction. A statement is, of course, literally false if it is (strictly speaking) literally false, but if it is not (strictly speaking) literally false, it can either be "literally false" for Lanham Act purposes if it unambiguously conveys a message and that message conflicts with reality, or it can be implicitly false if it conveys an "impression"—to a substantial portion of listeners—that conflicts with reality.

*Reed Constr.*, 49 F. Supp. 3d at 412.

*Avis* illustrates the potential for divergence between the wording of an advertisement and the message it "unambiguously conveys." In that case, Hertz was sued for advertising, "Hertz has more new cars than Avis has cars." *Avis*, 782 F.2d at 382. Hertz had 97,000 *new* cars, while Avis had 102,000 *cars*. *Id.* at 383. But more than 6,000 of Avis' cars "were in the process of being sold and were no longer available for rental." *Id.* at 384. Because the bare wording of the advertisement was not limited to cars that Avis had *for rent*, the trial court found the advertisement literally false. *Id.* at 382. On review, the Second Circuit was "left with the definite and firm conviction that a mistake ha[d] been committed,"

and reversed—notwithstanding the bare wording of the advertisement—because "the evidence pointed unmistakably to an interpretation that Hertz was speaking of cars available for rental and not of total cars owned." *See id.* at 384–85 (in part quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985)). In other words, Hertz's advertisement necessarily implied a literal truth, notwithstanding the apparent falsity of its bare wording. Conversely here, as shown below, First Data's advertisements necessarily imply (or at least could reasonably be found by a factfinder to necessarily imply) a literal falsehood—even if the district court were correct that the bare words, taken out of context, could be given a true construction.

### 2. What a Message Necessarily Implies Is an Issue of Fact, for the Jury

"Whether an advertisement is literally false is an issue of fact." *C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 434 (4th Cir. 1997). That includes both "the … determination of the meaning of the advertisement," generally, *see Avis*, 782 F.2d at 384, and what an advertisement "implicitly, though not expressly, asserts," more specifically, *see C.B. Fleet*, 131 F.3d at 436.

### 3. The District Court's Resolution of Literal Falsity on Summary Judgment Was an Exercise in Improper "Disputatious Dissection"

The district court invoked the principle that "only an unambiguous message can be literally false," *see Novartis*, 290 F.3d at 587—a corollary to which is, an advertisement that "can reasonably be understood as conveying" a true message is not literally false, *see Scotts Co.*, 315 F.3d at 275. But that gave no license to the district court to "engage in disputatious dissection" in search of some interpretation or parsing that *might* render the advertisement true, *see DIRECTV*, 497 F.3d at 158 ("a district court evaluating whether an advertisement is literally false … 'must … not … engage in disputatious dissection'"), because determining the unambiguous content of an advertisement remains an issue of fact, *see C.B. Fleet*, 131 F.3d at 436. On summary judgment, the district court's task was not to determine whether *it* thinks First Data's advertising "can reasonably be understood as conveying" a literally true message but instead to ascertain whether a reasonable jury could have concluded otherwise. Here, the district court overstepped those bounds.

The accused advertisements are:

> If you choose to use a third-party vendor for PCI DSS compliance services, you will need to contract with and pay that vendor directly. ***In addition*** to your alternate vendor's charges for PCI DSS compliance services, you still will need to pay the Compliance Service Fee charged to you by your merchant services provider. The Compliance Service Fee ***is not affected*** by your choice to use a third-party vendor.

And:

> If First Data's PCI compliance services are contractually available to you, you will be charged an applicable annual compliance fee for those services, regardless of whether you use them or utilize the services of some other third-party PCI compliance services vendor. If you utilize the additional services of a third party vendor, you will pay that third party vendor's charges for those fees **in addition** to First Data's annual compliance fee.

(JA 190 [boldface italics added].)  Those advertisements describe third-party fees as *in addition* to—i.e., above and beyond—First Data's compliance fee, which is further said to be "not affected" by utilization of a third-party vendor.[4]  First Data's advertisements are inconsistent with its actual refund policy, or at least a reasonable jury could so find, because the availability of a refund from First Data's compliance fee, to cover and offset third-party vendor charges, means third-party fees are *in lieu of*—not "in addition to"—First Data's fee.

According to the district court, "[First Data's] statements are only problematic due to what was left unsaid—that a refund might be available."  (JA 1369.)  But if the statements were "problematic," whether or not "due to what was left unsaid," then a reasonably jury could have found them false.  Moreover the district court's attribution of the statements' problematic character to "what was

---

[4] First Data drove the point home in collateral communications that told merchants they could either use PCI Rapid Comply or, instead, "[y]ou can choose to utilize other security service vendors, adding another contract *and yet another cost* to your operations."  (*See* JA 1813.)

left unsaid" is contradicted by its own prior determination that "SecurityMetrics' Counterclaim is articulable as an affirmative misstatement—i.e., that merchants will pay for the service but that some do not because of the refund."  (JA 146–47.) Finally, the district court's reasoning ignores *Avis*, where Hertz's advertisement mentioned only cars and left unsaid that its comparison was between cars *for rent*, but "for rent" was nevertheless necessarily implied.  *See Avis*, 782 F.2d at 384–85; *see also DIRECTV*, 497 F.3d at 158 ("though the statement, 'Hertz has more new cars than Avis has cars,' did not expressly qualify the comparison, given the surrounding context, it 'unmistakably' referred to the companies' rental fleets").

First Data's statements that third-party fees had to be paid "in addition" to its own fees, and that its fees were "not affected" by engagement of "a third party vendor," unmistakably entailed that First Data would not issue refunds, on demand, to cover the third-party fees.  *See Brother Indus., Ltd. v. United States*, 540 F. Supp. 1341, 1363 (C.I.T. 1982) ("Whether the purchaser receives a price discount at the time of sale or an after-sale rebate, the substance of the transaction is the same, and a fair price comparison must take the price reduction into account.").  That is reinforced by a counterfactual:  what would be the point of advertising that third-party fees would be "in addition to" First Data's compliance fee *unless the merchant asks for a refund*?  The unmistakable takeaway of the advertisements is, in First Data's words, that "[t]he Compliance Service Fee *is not*

*affected*"—whether *by way of refund* or otherwise—"by your choice to use a third-party vendor."  Indeed the import of First Data's advertisements is so clear that this Court could rule that they are literally false.  At a minimum, this Court should reverse and remand because at the very least, a reasonable jury could so find.

## B.    This Court Should Reverse the District Court's Hearsay Ruling and Remand SecurityMetrics' Tortious Interference Claim for Jury Trial

Over a period of two years, SecurityMetrics lost about 280,000 existing customers and attracted far fewer new customers than it would have if historical patterns had continued.  Mr. Nelson, a SecurityMetrics expert, attributed about 145,000 lost customers and another 68,000 unattracted customers—about $25 million in profits, altogether—to First Data's misconduct.  Mr. Nelson's analysis proceeded in two parts:  first, he analyzed the evidence (including customer emails and recordings of customer calls) to ascertain whether First Data's conduct might plausibly be characterized as a cause of SecurityMetrics' losses; second, to quantify the causal impact of that conduct, he conducted what the district court elsewhere acknowledged was "a complex analysis that included calculation and consideration of SecurityMetrics' natural attrition and penetration rates and a variety of other factors," (JA 1176).

On summary judgment, the district court:  (a) did not consider Mr. Nelson's quantitative analysis, at all; (b) held that the emails and call recordings were

inadmissible hearsay; and then, seeing no remaining evidence of causation before it, (c) summarily adjudicated SecurityMetrics' claim.

Behind the district court's summary judgment ruling looms a larger question:  how to prove and quantify liability for *hundreds of thousands* of disrupted commercial relationships?  Throughout, First Data's position has been that SecurityMetrics would have to separately and specifically identify, and prove liability (including causation) and damages for, *each* and *every* disrupted relationship.  The district court seems to have adopted an evidentiary formulation of the same principle when it held that "statements regarding [customers'] reasons for their dissatisfaction" had to be "obtain[ed] … directly from customers" rather than taken from "recorded phone calls and emails."  (JA 1375.)

In retrospect, that ruling may have been prefigured in a discovery ruling that the district court had made several months earlier.  SecurityMetrics had moved to compel First Data to produce more information about its customer base, which SecurityMetrics would have used to further fortify its injury case.  The district court denied the motion, reasoning:

> You certainly are capable of trying to identify all the customers whom you believe you have lost.  And you're certainly capable of trying to contact those customers and say, exactly what happened here, how did we lose your business? … You're certainly free to undertake that inquiry with respect to those former customers who your client clearly has a record of, they were your customers in terms of why they switched,

> whether or not they were forced to switch, whether or not it supports your antitrust tie-in complaint.
>
> But the notion that you're still entitled to get more information from First Data on this … I think is a bit much, quite frankly, and that's where we are on this.

(JA 567:7–22.) By that ruling, the district court barred SecurityMetrics from obtaining party-opponent-admissions evidence to prove its injuries and redirected SecurityMetrics to statements from lost customers.

The summary judgment ruling on tortious interference continued in the same vein. By not considering SecurityMetrics' *quantitative* proof of causation, the district court reinforced that SecurityMetrics would have to prove its case through lost-customer statements. Then the district court made even that proof practically unattainable by its hearsay ruling, according to which lost-customer statements could not be taken from business records but instead had to be presented in sworn testimony. Because the limits on discovery in federal cases simply do not permit sworn testimony to be obtained from more than a handful of customers, that shielded First Data from any but de minimis liability and made SecurityMetrics' case unwinnable. *Cf. Conwood*, 290 F.3d at 784 (6th Cir. 2002) ("to investigate activity at specific retail establishments would have been so costly as to have effectively ended this suit, despite substantial evidence of anti-competitive activity").

As shown below, the district court's summary judgment should be reversed because the standard of proof it imposed cannot be justified, either as a matter of policy or as a matter of law, and the evidence that SecurityMetrics presented was more than enough to support a jury finding of causation.

1. **The Proof Requirements Embraced by the District Court Are Untenable, as a Matter of Policy**

In any civil litigation, time and money will drastically limit the number of customers from whom evidence satisfying the district court's requirement could be directly obtained.  In *federal* civil litigation, those *practical* limits are reinforced by *formal* limits, such as the unavailability of written discovery directed to nonparties and increasingly parsimonious limits on the number and duration of oral depositions.[5]  Thus if First Data and the district court were correct about proof requirements then a tortfeasor's marginal cost for disrupting relationships would quickly drop to zero because practical and formal constraints would prevent the injured party from obtaining satisfactory causation evidence from more than a handful of lost customers.  Indeed that requirement would likely "operate to immunize the defendant from liability" *altogether*, at least in a low per-customer revenue context, because the damages available to the victim for a handful of

---

[5] By default, FRCP 30, subdivisions (a)(2)(A)(i) and (d)(1), limit litigants to ten seven-hour depositions, for a total of 70 deposition hours.  Here, the district court ratcheted the percipient-deposition limit down even further, to no more than 50 hours of deposition time.  (JA 131.)

customers could not possibly justify the cost of litigation. *See Kinty*, 544 F.2d at 725.

The district court's underlying theory of proof cannot be accepted because "the adoption of any arbitrary rule … which will relieve the wrong-doer from any part of the damages, and throw the loss upon the injured party, would be little less than legalized robbery." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 565, 51 S. Ct. 248, 75 L. Ed. 544 (1931) (quoting *Gilbert v. Kennedy*, 22 Mich. 117, 131 (1871)); *see also id.* at 563 ("Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.").

## 2.     The District Court's Proof Requirement Is Unwarranted, as a Matter of Law

This Court has already acknowledged an alternative method of proof, which other courts have adapted to the business tort context, which avoids the pitfalls of the customer-by-customer method that the district court incorrectly assumed is the only method available. Specifically, "[d]ifferential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999).

> Differential diagnosis generally provides a framework in which all reasonable hypotheses are "ruled in" as possible causes … and some of these possible causes are then "ruled out" to the extent scientific evidence makes it appropriate to do so. The goal is to identify the last remaining, or most probable, "ruled in" cause …

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 903 (7th Cir. 2007).

Other courts have upheld the application of that methodology to business torts, albeit without recognizing or commenting on the medical analogy. In *General Auto Parts Co. v. Genuine Parts Co.*, 979 P.2d 1207 (Idaho 1999), Genuine Parts Co. ("GPC") entered into an agreement with Frank Workland under which General Auto Parts Co. ("General") became GPC's exclusive distributor of NAPA auto parts in the Boise, Idaho area. *See id.* at 1209. GPC breached that agreement by purchasing Cal's Service Parts Company of Boise, Inc. ("Cal's") and distributing NAPA parts through several of Cal's stores. *See id.* General sued, claiming lost profits. *See id.* "After both parties rested at trial, GPC moved for a directed verdict on General's breach of contract claim," which was denied. *Id.* at 1210.

On appeal, GPC made the argument seemingly accepted by the district court in this case, "contend[ing] that the only acceptable evidence of causation … would be testimony from the customers that General had lost, explaining why they had reduced their business with General." *General Auto*, 979 P.2d at 1217. But the *General Auto* court disagreed and held, "[c]ontrary to GPC's position, there is

sufficient evidence in the record to allow a jury to conclude that the inference

linking GPC's conduct to General's damages is more probable than the inference

connecting General's loss to the other factors identified." *Id.* That evidence was

weaker than, but similar in kind to, SecurityMetrics' evidence here:

> Frank Workland had testified that there were no other factors
> other than the changeover of Cal's which had an adverse effect
> on his business. However, as GPC points out, on cross-
> examination Frank Workland admitted that other factors could
> have affected General's decline in sales …
>
> … General's economic expert, Dr. Frankle, testified that
> General's actual sales from 1992 through 1996 were
> significantly lower than what its sales should have been for that
> time period. … Although Dr. Frankle was not allowed to testify
> that GPC's conduct actually caused General's decrease in sales,
> the district court believed Dr. Frankle's methodology was an
> acceptable approach, and ruled that his testimony was
> circumstantial evidence tending to corroborate Frank
> Workland's initial testimony that there were no other factors,
> other than the changeover of Cal's, which had an adverse effect
> on his business.

*Id.* at 1217–18. The court concluded that based on the evidence presented, "[a]

reasonable juror could conclude that the significant drop in NAPA sales after GPC

changed six stores in the Boise area into NAPA dealerships was caused by the

competition in the sale of NAPA parts rather than the factors suggested by GPC."

*Id.* at 1218.

Citing *General Auto Parts*, the Idaho Supreme Court later expressly held,

contrary to the district court's assumption in this case: "[t]he party seeking to

recover lost profits is not required to obtain the testimony of the customers allegedly lost as a result of the wrongdoer's conduct." *Alphonsus Diversified Care, Inc. v. MRI Associates, LLP*, 334 P.3d 780, 790 (Idaho 2014). Instead, "[t]here only need be sufficient evidence in the record to allow the jury to conclude that the inference linking the wrongdoer's conduct to the claimant's damages is more probable than the inference connecting such loss to other factors." *Id.* And as *General Auto Parts* illustrates, that "sufficient evidence" can take the form of a differential etiology analysis like SecurityMetrics'.

### 3. This Court Should Reverse because Mr. Nelson's Differential Etiology Analysis, Alone, Would Sustain a Jury Verdict in SecurityMetrics' Favor

Here SecurityMetrics' expert, Mr. Nelson, relied on customer emails and call recordings produced by SecurityMetrics to "rule in" First Data's misconduct as a possible cause for high attrition that SecurityMetrics experienced among the merchants to whom First Data acted as acquirer. (*See* JA 1810–26.) He then "ruled out" (or otherwise accounted for) other possible causes, including routine attrition, (*see* JA 1830–32), the change from a collaborative to a competitive relationship with First Data, (*see* JA 1831), customer satisfaction with SecurityMetrics, (*see* JA 1831–34), the adequacy of SecurityMetrics' service, (*see* JA 1834–35), and the nature of SecurityMetrics' relationships with customers in the pool experiencing the abnormally high attrition, (*see* JA 1836). Based on all of

46

that, Mr. Nelson concluded that of the more than 280,000 Level 4 merchants in First Data's acquirer portfolio that SecurityMetrics lost as customers, about 145,000 were lost due to First Data's misconduct. Mr. Nelson performed a similar analysis to calculate the number of Level 4 merchants who did not become SecurityMetrics' customers, due to First Data's misconduct. (*See* JA 1859, 1866–67.)

Mr. Nelson's analysis proves causation even more convincingly than Dr. Frankle's in *General Auto Parts* because Mr. Nelson accounted for each alternative explanation offered by First Data:

> A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation. However, "[a] medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness." The alternative causes suggested by a defendant "affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony," unless the expert can offer "*no* explanation for why she has concluded [an alternative cause offered by the opposing party] was not the sole cause.

*Westberry*, 178 F.3d at 265 (citations omitted). The only alternative explanation First Data has ever suggested is its own transition from a collaborative to a competitive relationship with SecurityMetrics, which Mr. Nelson anticipated and addressed in his report (which the district court *denied* First Data's motion to exclude, *see* JA 1185, ¶ 3).

The district court's conclusion that "recorded phone calls and emails" were "the only evidence offered to demonstrate causation of damages" entirely overlooks Mr. Nelson's differential etiology analysis—and that analysis, by itself, is enough to sustain a jury verdict. That is the first reason this Court should reverse.

### 4. This Court Should also Reverse because the District Court's Hearsay Ruling Is Inapposite and Incorrect

A second reason for reversing is that, given the role played by SecurityMetrics' call recordings and emails in its causation analysis, the district court's hearsay ruling is not only inapposite but also incorrect. That ruling is inapposite for two reasons: first, because SecurityMetrics' differential etiology analysis came into evidence through Mr. Nelson and experts may rely on hearsay; and second, Mr. Nelson's analysis would be sufficient *even without the emails and call recordings*. Even without the emails and call recordings, a jury could reasonably conclude that merchants who were told lies about First Data's pricing and about SecurityMetrics would be deterred from using SecurityMetrics; so no evidence is needed to "rule in" First Data's misconduct. That conduct having been ruled in, by common sense, Mr. Nelson's "complex analysis" sufficiently ruled out alternatives.

The district court's hearsay ruling is incorrect because SecurityMetrics (through Mr. Nelson) relies on its emails and call recordings to "rule in" First

Data's misconduct as an explanation for SecurityMetrics' inordinate losses. They

rule that conduct in by showing that effects that might naturally be expected to

flow from First Data's misconduct could, in turn, cause customers to choose First

Data rather than SecurityMetrics. For example, a belief that PCI Rapid Comply is

cheaper to use is a natural and foreseeable consequence of First Data's

representations that merchants who use another vendor will have to pay twice for

their PCI compliance services. In the emails and call recordings that

SecurityMetrics proffered, customers self-report such beliefs as their motive for

choosing First Data rather than SecurityMetrics. Proving that such beliefs

motivate observed behavior is the only purpose for which SecurityMetrics would

introduce the emails or call recordings themselves into evidence—and that is

different than whether First Data engaged in the conduct attributed to it by those

customers in those communications; that the malfeasance had occurred would be

established by *other* evidence, the sufficiency of which was not contested on

summary judgment.

The relevant distinction is recognized in a series of cases reaching back to

*Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906 (2d Cir.

1962), which taught that "[s]tatements of a customer as to his reasons for not

dealing with a supplier are admissible for this limited purpose"—i.e., to show his

reasons for not dealing with a supplier—"although not 'as evidence of the facts

recited as furnishing the motives'"—i.e., to show that the "facts" given as reasons actually obtained.  *See id.* at 914 (citations omitted).  *Herman Schwabe* held that the district court's exclusion of a series of letters from prospective customers, offered to show the lingering effects of the defendant's formerly predatory pricing, was error.  *See id.* at 913–14.  The improperly excluded letters plainly recited factual predicates for the customer's decisions, *see id.* at 913 n. 9—but because they were offered only to show customer motive and not to prove the pricing differential, which was undisputed, they were admissible, *see id.* at 913–14.  That is exactly the situation presented, here:  the district court did not question whether the misconduct that SecurityMetrics alleged had occurred or would otherwise be proven, but concluded only that SecurityMetrics did not have admissible evidence that the assumed or separately proven conduct caused SecurityMetrics' injuries.

In the same vein, *Hydrolevel Corp. v. American Society of Mechanical Engineers, Inc.*, 635 F.2d 118, 128 (2d Cir. 1980), following *Herman Schwabe*, upheld the admission of "alleged hearsay testimony … on conversations with potential Hydrolevel customers who indicated concern that Hydrolevel's device did not meet ASME requirements."

As the Third Circuit has also recognized, customer statements are admissible for "the purpose of proving customer motive, but not as evidence of the facts recited as furnishing the motives."  *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909

F.2d 1524, 1535 n. 11 (3d Cir. 1990). *J.F. Feeser* recognized that a customer

giving "the reason why a customer was not doing business with a particular seller

is relevant in a lost profits/sales inquiry and its causal connection to the pricing

practices of the alleged violator," and evidence of such statements is thus

admissible under FRE 803(3). *Id.*; see also *Kraft Gen. Foods, Inc. v. BC-USA,*

*Inc.*, 840 F. Supp. 344, 347–48 (E.D. Pa. 1993) (hearsay objection overruled,

where "Bertran reported that one customer told him that he thought the two brands

were different versions made by the same company" and "[a]nother customer said

that he had picked up the Pennsylvania packages by mistake because the two

brands were on the same shelf and both had silver packaging").

Within the Fourth Circuit, *Gallimore v. Newman Machine Co.*, 301 F. Supp.

2d 431 (M.D.N.C. 2004), followed the same reasoning. In that case, the plaintiff

submitted an affidavit declaring, in part:

> Dr. Stephan Lowe told me that I could return to work, but that I
> needed to have a more sedentary job. He told me that I could no
> longer perform strenuous work or stand for prolonged periods
> and that I could not bend at the waist or lift heavy objects.
>
> Dr. Lowe had told me that if I were ever to fall, I would probably
> crack my pelvis, shatter my femur or dislocate my hips.

*Id.* at 436. The defendants objected to those statements as "classic inadmissible

hearsay"; the plaintiff responded "that the first statement demonstrates plaintiff's

'then existing state of mind and his motive for requesting a transfer to the CNC

machines' and the second statement demonstrates Plaintiff's 'then existing state of mind . . . . and his motive for asking to sit down'"; and the court agreed with the plaintiff:

> Plaintiff's statements are admissible to show Plaintiff's then existing state of mind and his reasons for requesting a transfer and for sitting down. … [H]owever, … Plaintiff may not use these statements for the hearsay purpose of proving the truth of the matter asserted in these statements, that is, the extent of Plaintiff's actual medical limitations and conditions.

*Id.* at 436–37. Even if the district court's ruling were supported by the only case it cites in support, *Air Turbine Technology, Inc. v. Atlas Copco AB*, 295 F. Supp. 2d 1334 (S.D. Fla. 2003), *aff'd*, 410 F.3d 701 (Fed. Cir. 2005),[6] that stray opinion is clearly against the weight of authority.

SecurityMetrics offered emails and call recordings only to prove state of mind—what customers believed and why they did what they did; and for *that* purpose they were admissible under FRE 803(3). This Court should reverse the district court's summary judgment and remand for jury trial of SecurityMetrics' tortious interference claim for two independently sufficient reasons. First, the differential etiology analysis presented by SecurityMetrics' expert, Mr. Nelson, is sufficient to support a jury finding of causation. Second, the district court's hearsay ruling is both inapposite, because experts may rely on hearsay, and

---

[6] Although the *Air Turbine* judgment was affirmed, its hearsay ruling was "not challenge[d] … on appeal." *Air Turbine*, 410 F.3d at 710.

incorrect, because the use to which SecurityMetrics put emails and call recordings brings them within the state of mind exception to the exclusionary hearsay rule.

## C. This Court Should Reverse the District Court's Antitrust Injury Ruling and Remand SecurityMetrics' Antitrust Claims for Jury Trial

The district court granted summary judgment on SecurityMetrics' antitrust claims because it concluded that SecurityMetrics had made an inadequate showing of antitrust injury.  "The concept of 'antitrust injury' is derived from … *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)."  *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 691 F.2d 678, 689 (4th Cir. 1982).  *Brunswick* held that private claimants under the antitrust laws "must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489.

The antitrust injury requirement "does not necessarily mean … that … plaintiffs must prove an actual lessening of competition in order to recover." *Brunswick*, 429 U.S. at 489 n. 14.  Rather, "competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened." *Id.*

Recognized forms of antitrust injury include (i) reducing output, *Capital Imaging Assocs. v. Mohawk Valley Medical Assoc.*, 996 F.2d 537, 546 (2d Cir.

1993), and (ii) frustrating price competition, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979). SecurityMetrics alleged both, but the district court concluded that SecurityMetrics had not shown that either presented a triable issue of fact. As shown below, that was error and there was a triable issue with regard to both.

## 1. The District Court's Reduced Output Ruling Should Be Reversed

To show reduced output, SecurityMetrics pointed out that of about 360,000 Level 4 First Data acquirer merchants who had been SecurityMetrics customers, before First Data began its unfair and anticompetitive campaign, SecurityMetrics lost about 280,000 in just two years; only 70,000 of those lost customers went to First Data; and that left 210,000 merchants unaccounted for. SecurityMetrics argued that a jury could infer that output was reduced because many of those 210,000 left the PCI compliance services market. On summary judgment, the district court found:

> the reduced output theory was newly raised at the summary judgment stage; was unsupported by any expert testimony or information obtained through third party discovery; and relied upon speculative conclusions rather than facts in the record.

(*See* JA 1934.)

### a. Summary Judgment Was Not Justified by Either Timing or Expert Testimony Considerations

Taking the district court's grounds in order, whether or not "reduced output … was newly raised at the summary judgment stage" is wholly immaterial because SecurityMetrics did not have, and the district court never identified, any obligation to articulate specific antitrust injuries earlier in the proceedings.

The reference to expert testimony is similarly puzzling. Expert testimony is never *required* unless "a party seeks to prove an issue that is beyond the ken of the jury." THE NEW WIGMORE: EXPERT EVIDENCE § 2.5 (2016); *see also Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S. Ct. 1119, 8 L. Ed. 2d 313 (1962) (citation and quotation omitted) ("expert testimony … is unnecessary … if … the jury … are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation"). Here, the district court's specific criticism was that SecurityMetrics had not presented evidence that merchants who had (1) left SecurityMetrics (2) without enrolling for First Data's PCI Rapid Comply had "continued operations without obtaining a new compliance services vendor." (JA 1377.) Because whether or not merchants had "continued operations without obtaining a new compliance services vendor" is not "beyond the ken of the jury," the district court erred by requiring expert testimony. *See United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 324 (4th Cir. 1982) (in Sherman Act case,

affirming exclusion of expert testimony that "did little more than correlate higher contracting costs with longer hauling distances" because "lay jurors were fully able to understand and appreciate the implications of the evidence admitted"); *see also Capital Imaging*, 996 F.2d at 546 (the "that the defendants' conduct … has had a substantially harmful effect on competition" can be demonstrated "without 'detailed market analysis' by offering '"proof of actual detrimental effects, such as a reduction of output"'"").

> **b.** **The District Court Misallocated the Burden of Proving whether Unaccounted-for Merchants "continued operations without obtaining a new compliance services vendor"**

That leaves the district court's conclusions that reduced output "was unsupported by … information obtained through third party discovery; and relied upon speculative conclusions rather than facts in the record." (JA 1934.) In other words, according to the district court, SecurityMetrics should have deposed the 210,000 unaccounted-for merchants to determine whether they had "continued operations without obtaining a new compliance services vendor." (*See* JA 1377.)

First Data successfully resisted SecurityMetrics' efforts to obtain discovery from First Data that was granular enough to perform a customer-by-customer analysis, which SecurityMetrics could have used to definitively ascertain which of its 210,000 lost customers were continuing to obtain acquirer services from First Data, "without obtaining a new compliance services vendor." (*See* JA 424:7–22.)

First Data *did* produce documents with *aggregate* noncompliant-merchant counts.

Presumably—especially with inferences drawn in SecurityMetrics' favor, as they

should have been on summary judgment—customers whom SecurityMetrics lost,

who did *not* "continue[] operations without obtaining a new compliance services

vendor," were not included in First Data's noncompliant-merchant counts: if they

had obtained new vendors, they would be counted as *compliant* merchants; and if

they had not "continued operations," they would not have been counted at all. But

the noncompliant merchant counts reported in First Data's documents are too high

*not* to include most or all of SecurityMetrics' lost customers. (*See* JA 1635.)

Therefore, the limited information First Data *did* produce evidences reduced

output.

And even if there were no evidence, the district court misallocated the

burden of proof by requiring SecurityMetrics to develop and present third-party

evidence that its lost customers had "continued operations without obtaining a new

compliance services vendor."

> Where the evidence necessary to establish a fact essential to a
> claim lies peculiarly within the knowledge and competence of
> one of the parties, that party has the burden of going forward with
> the evidence on the issue although it is not the party asserting the
> claim.

*Morris v. Williams*, 433 P.2d 697, 715 (Cal. 1967); *accord Denver & Rio Grande*

*R. Co.*, 191 U.S. at 92; *Pace v. Hymas*, 726 P.2d 693, 697 (Idaho 1986) (citing

cases).  Here, because merchants were reporting compliance to First Data (in its processor/acquirer role), the reporting status and channel for the 210,000 unaccounted-for merchants was "peculiarly within the knowledge and competence" of First Data.  That means First Data—not SecurityMetrics—bore the burden of production.  Thus instead of granting summary judgment, based on SecurityMetrics' failure to depose 210,000 third parties,[7] the district court should have denied summary judgment, based on First Data's failure to present evidence it already had regarding those 210,000 merchants.

> **c.  Profitability Analysis Considerations Did Not Justify Summary Judgment, Either**

The district court also commented:  "SecurityMetrics has provided no analysis to back up its assertions regarding the profitably and revenue potential from First Data's non-compliance fees."  That cannot sustain the district court's summary judgment ruling—first because "profitability and revenue potential" need not be shown and second because SecurityMetrics *did* present an analysis, consisting of the application of basic arithmetic to First Data's own numbers.  Adverting to the tabular summary given above:

---

[7] Assuming each deposition would have lasted one hour—and eight depositions per day, five days per week—210,000 third-party depositions would have taken a little over 100 years to complete.  And presenting just six-minute snippets from each deposition at trial would take over a decade.

|  | | Validates Compliance? | |
|---|---|---|---|
|  | | Yes | No |
| **Uses Third-party Vendor?** | Yes | Lowest revenue because:<br><br>1. ACF reduced by "empowerment policy" refund<br><br>2. Pays no NVF | Most revenue because:<br><br>1. Pays full ACF<br><br>2. Pays NVF |
| | No | Intermediate revenue because:<br><br>1. Pays full ACF<br><br>2. Pays no NVF | Most revenue because:<br><br>1. Pays full ACF<br><br>2. Pays NVF |

Because that simple math is not "beyond the ken of the jury," *see* THE NEW WIGMORE: EXPERT EVIDENCE § 2.5, SecurityMetrics was not required to present it through an expert. More generally, no further "analysis … regarding … profitability" was needed.

The only substantial basis that the district court articulated for summarily adjudicating reduced output was the absence of evidence showing whether or not the 210,000 unaccounted-for merchants "continued operations without obtaining a new compliance services vendor"; and because that lay "peculiarly within the knowledge and competence" of First Data, the absence of such evidence should have resulted in summary judgment being *denied* to First Data, not granted.

### 2. The District Court's Ruling on Price Competition Frustration Should Be Reversed

First Data's pricing policies are, on their face, inconsistent with price competition. First Data's *advertised* policy was that merchants who engaged third-party vendors would still have to pay for First Data's service, *in addition to* the third-party's service—which obviously would make it impossible for merchants to pay less by using a third-party vendor. First Data's *unadvertised* policy was to refund to merchants who validated using third-party vendors whatever those merchants paid to the third-party vendors. This at least allowed merchants using third-party vendors to not pay more than they would for using First Data; but still it prevented third-party vendors (like SecurityMetrics) from *undercutting* First Data's price: even under the secret refund policy, the best a merchant could do by using a third-party vendor was not pay more for the privilege.

Notwithstanding the facially anticompetitive character of First Data's pricing policies, the district court concluded that "SecurityMetrics … failed to offer sufficient evidence" of frustrated price competition because (1) "SecurityMetrics intends to proceed on such a claim absent any expert testimony" and (2) "SecurityMetrics looks only to the prices of First Data and itself and includes no factual discussion or analysis of the price of competitors in the marketplace." (JA 1378.)

Taking those in order, a jury could understand how First Data's pricing policies prevented competitors from undercutting it, even without expert testimony.  *See* THE NEW WIGMORE:  EXPERT EVIDENCE § 2.5 (expert testimony is only required "to prove an issue that is beyond the ken of the jury").  Moreover SecurityMetrics *did* present expert testimony:  an opinion from Dr. Pleatsikas that if First Data's policies were widely applied then they would have widely frustrated price competition.  First Data derided that opinion as no opinion at all, but "an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts." FRE 702, Advisory Comm. Note; *see also id.* ("when … the trier can itself draw the requisite inference," "opinions are not indispensable").  And SecurityMetrics had other evidence to show the jury that First Data had widely implemented its anticompetitive policies—including, for example, (1) program rollout materials produced by First Data indicating that the *advertised* policy would apply to all merchants and (2) evidence of First Data's *unadvertised* refund policy.  The only thing lacking was evidence to support First Data's contention that neither the advertised policy nor the secret refund policy had been broadly applied.  Especially given that lopsided evidentiary presentation, the district court should not have entered summary judgment against SecurityMetrics—the only party with *any* evidence to support its position.

The district court's second criticism, that "SecurityMetrics looks only to the prices of First Data and itself and includes no factual discussion or analysis of the price of competitors in the marketplace," was directed to a secondary percipient declaration that SecurityMetrics submitted, stating in part:

> SecurityMetrics' pricing to ISOs ranges between $1.75 and $2.50 per merchant per month. Most commonly the price term is negotiated to about $2 per merchant, to compete with non-FDMS or third party providers such as Trustwave.

The point that declaration makes is that $2 per merchant was effective competitive pricing for non-First Data PCI compliance vendors. This was in contrast to First Data, with which SecurityMetrics had been unable to compete effectively on price, despite being priced about a dollar lower per merchant—as evidenced by the fact that SecurityMetrics had lost three-fourths of its Level 4 First Data merchants. By dismissing this evidence as looking "only to the prices of First Data and [SecurityMetrics]," the district court failed to read it in the light most favorable to SecurityMetrics, as required on summary judgment.

On their face, First Data's policies were inconsistent with price competition; that alone should have prevented summary judgment on antitrust injury. Moreover SecurityMetrics presented both expert and percipient evidence that First Data's policies were *effective* frustrators of price competition. Thus summary judgment should never have been granted and should now be reversed.

## CONCLUSION

SecurityMetrics respectfully requests that this Court:

1.     Reverse the district court's ruling that a reasonable jury could not find First Data's accused advertisements literally false, and remand SecurityMetrics' false advertising claim for jury trial;

2.     Reverse the district court's hearsay ruling and remand SecurityMetrics' tortious interference claim for jury trial; and

3.     Reverse the district court's antitrust injury rulings and remand SecurityMetrics' restraint of trade and attempted monopolization claims for jury trial.

Dated:  February 5, 2016                    Respectfully submitted,

MASCHOFF BRENNAN LAYCOCK
   GILMORE ISRAELSEN & WRIGHT PLLC

/s/ *L. Rex Sears*
Sterling A. Brennan
   *sbrennan@mabr.com*
L. Rex Sears
   *rsears@mabr.com*
201 South Main Street, Suite 600
Salt Lake City, Utah 84111
(435) 252-1360

J. Stephen Simms
   *jssimms@simmsshowers.com*
SIMMS SHOWERS, LLP
201 International Circle, Suite 250
Baltimore, Maryland  21030
(410) 783-5795

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [13,998] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2013*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated:  February 5, 2016            MASCHOFF BRENNAN LAYCOCK
                                    GILMORE ISRAELSEN & WRIGHT PLLC

                                  /s/*L. Rex Sears*

## CERTIFICATE OF SERVICE

I, L. Rex Sears, certify that on February 5, 2016 the foregoing Brief for

Defendant-Appellant was served on all parties or their counsel of record and filed

with the Court through the CM/ECF system. I further certify that I caused one

paper copy of the foregoing Opening Brief of SecurityMetrics, Inc. to be hand

delivered to the Clerk of this Court at the following address:

U.S. Court of Appeals for the Fourth Circuit
1100 East Main Street, Suite 501
Richmond, Virginia 23219

Dated: February 5, 2016

MASCHOFF BRENNAN LAYCOCK
GILMORE ISRAELSEN & WRIGHT PLLC

/s/ *L. Rex Sears*